**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**STEFANIA LAURA SANCHEZ CORREA,**

**Petitioner,**

**v.**

**DELANEY HALL DETENTION FACILITY, et al.,**

**Respondents.**

**Civil Action No. 26-4876 (RK)**

**MEMORANDUM OPINION & ORDER**

This matter has been opened to the Court by Petitioner's Motion to Enforce the Court's Order granting a bond hearing. (ECF No. 18.) For the reasons explained in this Memorandum Opinion, the Motion to Enforce is GRANTED.[1]

Petitioner is a citizen of Colombia and entered the United States on or about November 17, 2024, without being admitted, inspected, or paroled by an immigration officer. (ECF No. 10-1 at 2 (2026 Form I-213).) Immigration officials encountered Petitioner on November 18, 2024, and issued her a Notice and Order of Expedited Removal. (*Id.*; *see also* ECF No. 10-3 (Notice and Order of Expedited Removal).)

In her credible fear interview on November 19, 2024, Petitioner stated that her partner, who was a member of Grupo Armador de Alta Defensa, threatened her and subjected her to physical and sexual abuse for years and also threatened to harm their daughter if she did not cooperate with him. (ECF No. 21-2 at 18-28 (Credible Fear Interview).) The agent asked Petitioner what work

[1] Petitioner's counsel also filed a letter on August 24, 2026, seeking adjudication of the Motion to Enforce due to her client's interview with USCIS the next morning. The Court denies this request as moot.

her partner asked her to perform and if she was harmed or threatened if she failed to perform work for anyone. She stated that her partner forced her to collect money for him, have sexual relations with him against her will, and also asked her to hide guns and illegal money. (*Id.* at 26-27.) Her partner also subjected her to severe physical abuse and threatened to harm her and her daughter if she resisted his demands. (*Id.* at 27-29.) The asylum officer asked these questions to determine if Petitioner was a victim of human trafficking. (*Id.* at 26.) The Court excerpts the most relevant portions of that exchange:

> Q: Has anyone ever harmed or threatened you or a family member you were traveling with if you or the family member did not perform work for them?
>
> A: In Colombia
>
> Q: Who harmed or threatened you or a family member you were traveling with if you or the family member did not perform work for them?
>
> A: The girl's father
>
> Q: What is his name?
>
> A: [J.V.]
>
> Q: What work did he have you do?
>
> A: Asked me to hide fire arms [sic] for him and illegal money. I also had to commit sexual acts with him against my will.
>
> Q: Aside from sexual acts, did he have you to do any other work for him?
>
> A: Just for me to gather money and put away weapons[.]
>
> Q: Where did you get this money from?
>
> A: He would go get them from people in stores and warehouses and I would have go and de-mand [sic] it.
>
> Q: Why did they pay the money?
>
> A: He was charging the amount he would tell them if he if they do not pay the money he would burn the business or have them leave the barrio or he would kidnap the family[.]
>
> Q: Is [JV] part of a group or would he do this on his own?
>
> A: Grupo armador de Autodefensa (AD)[.]
>
> Q: How long did he make you do this for him?

A: On many occasions, and he would threaten that if I did not do so he would harm the girl or separate her from me.

Q: When did he begin making you do this work?

A: About 7 years ago[.]

Q: When was the most recent he made you do this work?

A: It was about 2 months ago[.]

Q: And did he always uh threaten you to do this work or did you ever do the work willingly[?]

A: No he would always threaten to do something to me or something to the girl[.]

Q: When you say the girl are yo[u] referring to your daughter?

A: Yes, my daughter[.]

Q: Where [sic] you ever a member of AD?

A: No[.]

Q: Did you do any other work for the group aside from what your partner had you do?

A: No since I would resist doing things, he would do other things to me out of his rage.

Q: And did you ever take weapons with you with you when you had to demand money from these people?

A: No they were already aware and waiting I would only go and ask for the money he would be at some place else watching as they would give me the money[.]

Q: What would he say in the threats to you?

A: It would be in the house if I did not do as he asked he would harm me people were for my pet harm my family if I did not listen he would arrive at night time and abuse me and and he would hit as well[.]

Q: Did he ever say how he would harm you?

A: Many times threaten me with weapons tried to cut my hair, he would hit me in the face on one occasion he just destroyed my breast had to have them reconstructed[.]

Q: How long were you in a relationship with [J.V.]?

A: Since 15 years of age[.]

Q: When did you[r] relationship end?

A: Last week when we managed to escape from him.

(ECF No. 21-2 at 26-28.)

After the asylum officer determined that she did not have a credible fear of persecution, Petitioner sought review by an immigration judge ("IJ"), who overturned that determination. (ECF No 10-4 (Notice of Referral to IJ; ECF No. 10-5 (Credible Fear IJ Review Order).) In that proceeding, the Immigration Court reviewed Petitioner's statement to the asylum officer but focused his questioning on the abuse Petitioner suffered and did not question Petitioner about whether she aided her husband in his criminal activities. (ECF No. 23 (Credible Fear Hearing at 8-25).) The Immigration Court determined that Petitioner and her daughter "established a significant possibility of eligibility for asylum based on membership in a particular social group." (*Id.* at 19.)

Petitioner was issued a Notice to Appear ("NTA") on November 23, 2024, and placed in full immigration removal proceedings. (ECF No. 10-6 (Notice to Appear).) Immigration officials released Petitioner from custody on November 24, 2024, noting that she was released under parole until January 17, 2025, pursuant to ICE's authority under section 212(d)(5)(A) of the Immigration and Nationality Act. (ECF No. 10-7 (Parole Document).) As a condition of her parole, Petitioner was required to report to Immigration and Customs Enforcement ("ICE") as part of the Compliance Assistance Reporting Terminal ("CART") program. (ECF No. 10-1 at 2.)

Petitioner subsequently married a United States citizen, and, on August 27, 2025, her husband filed a Form I-130, Petition for Alien Relative on her behalf.[2] (*Id.* at 16-17 (Form I-130); *see also id.* at 34 (Marriage Certificate).)

---

[2] Petitioner and her husband have filed a separate mandamus action seeking adjudication of her adjustment of status application. (Civ. Act. No. 26-7819.)

On April 10, 2026, Petitioner reported to ERO Newark for a CART appointment, and she was arrested and detained her pending her removal proceedings. (ECF No. 10-1 at 3.) DHS records state that she has no criminal history or gang or terrorist affiliation (*id.* at 3-4), and it appears she was compliant with the terms of her parole.

On April 23, 2026, an IJ denied bond finding that she was subject to mandatory detention under 8 U.S.C. § 1225(b) because she was transferred from expedited to full removal proceedings. (ECF No. 1-2 at 8 (IJ Order (Apr. 23, 2026)).) On April 28, 2026, the IJ again found it lacked jurisdiction to release her on bond. (*Id.* at 10 (IJ Order (Apr. 28, 2026)).)

Petitioner filed the instant Petition on April 30, 2026, seeking release or a bond hearing under 8 U.S.C. § 1226(a). (ECF No. 1.) She was ordered removed by the Immigration Court on May 13, 2026 (ECF No. 10-8 (Removal Order), but has appealed that determination to the Board of Immigration Appeals ("BIA"). (ECF No. 11-1 (EOIR Appeal).)

This Court granted the Petition on June 23, 2026, finding that Petitioner was not subject to mandatory detention under § 1225(b)(1) following her release on parole under § 1182(d)(5)(A). The Court ordered Respondents to provide Petitioner with an individualized bond hearing under § 1226(a). (ECF Nos. 13-14.)

The bond hearing occurred on July 7, 2026. During the hearing, the DHS attorney asked Petitioner if she admitted to aiding Grupo Armador de Alta Defensa by hiding firearms and illegal money, and Petitioner stated that she witnessed this activity. (ECF No. 21-1 at 8 (Bond Hearing Transcript).) Petitioner's counsel objected to this line of questioning, as the credible fear interview transcript had not been uploaded to the immigration file, and Petitioner and her attorney had not been given the opportunity to review it prior to the bond hearing. (*Id.*) Petitioner's attorney argued that Petitioner should not be confronted with a document she did not have the opportunity to review

and emphasized that the IJ would not have overturned her negative credible fear determination if Petitioner were aiding a criminal organization. (*Id.* at 8.) Over Petitioner's attorney's objection, the Immigration Judge permitted the DHS attorney to upload the credible fear interview transcript and question Petitioner about it. (*Id.* at 9-11.)

The DHS attorney argued that Petitioner "is an extreme danger to the community, considering she admitted under oath that she was aiding a criminal organization in that interview. She testified that she answered questions truthfully, and right here in front of you, she denied having involvement in that. So this individual is a danger to the community, aiding a criminal organization, involvement in that." (*Id.* at 12.) The DHS attorney also argued that Petitioner is a flight risk given that she had been ordered removed. (*Id.* at 12-13.)

Petitioner's counsel argued that Petitioner was a trafficking victim, that the evidence was incomplete without the admission of the transcript of the credible fear hearing, and that Petitioner had clarified that "she saw this activity but didn't necessarily participate[.]" (*Id.* at 13.) Petitioner's counsel also argued that the withdrawal of her asylum claims was a legal strategy of her prior attorney based on her adjustment of status application. (*Id.* at 13-14.)

The Court then made the following ruling:

> Okay. All right. So the Court's considered the information. The Court [has] great concern with respect to the information regarding history as it related to firearms and illegal money back in 2024. The Court notes that the -- according to the interview, which is the information the Court has in front of it, the last time this particular individual, [J.V.] [phonetic], required the Respondent to perform or to conduct certain actions was about 2 months prior to the interview, which occurred, the Court notes, on November 19, 2024.
>
> The question that the Court has isn't so much that -- with regard to firearms and illegal money. Again, this is an asylum interview, so the -- it's the second part of where she says, "He also had me commit sexual acts with him against my will." Plain English would mean that it was relating to sexual acts versus firearms and illegal money, though the Court notes that this apparently occurred for some time.

> The Court doesn't have a clear answer with respect to those considerations, but what the Court does have a clear answer to is with respect to the current proceedings and the basis for the appeal.
>
> The Court does note Counsel's position with regard to collateral relief and the fact that the marriage -- the Court has reviewed the marriage certificate. The Court understands that the couple was married -- I believe it was the beginning of 2025, so they've been married for a little over a year and a half, and that based off the information provided, they've gone through significant efforts to try and address status or provide for the Respondent in order to complete some sort of effort to remain in the United States. The Court, however, in considering this, specifically with regard to danger, the Court has to view what it has in front of it.
>
> So, in that regard, given the activity, given the history without clarification that's being offered, the Court at this particular juncture would have to determine that the Respondent, given the recency of the information, that being the dates that were offered, that the Court would consider the Respondent a danger and, as such, would deny bond. Not getting to flight, I'm gonna [sic] deny on the danger aspect.

(*Id.* at 15-16.)

Petitioner asked the Immigration Court to reconsider its decision, but on August 21, 2026, a different IJ allegedly "declined to reconsider the prior determination." (ECF No. 23 at 2.) Respondents have not responded to this new allegation or provided any clarification, and the Court does not consider it in rendering a decision on whether the original bond hearing was fundamentally unfair.

The Third Circuit has recognized that 8 U.S.C. § 1226(e) does not deprive federal courts of jurisdiction to address due process challenges to bond hearings. Under that provision, Courts "lack jurisdiction to review any discretionary determinations underlying the IJ's bond decision," and "are limited to reviewing only . . . challenges that pertain to the adequacy of process [petitioner] received at [her] bond hearing." *Quinteros v. Warden Pike Cnty. Correctional Facility*, 784 F. App'x 75, 78 (3d Cir. 2019). Therefore, the Court has jurisdiction to determine whether the bond hearing conducted on July 7, 2026, was fundamentally unfair in violation of this Court's

order. *See Ghanem v. Warden Essex Cnty. Corr. Facility*, Civ. A. No. 21-1908, 2022 WL 574624, at *2 (3d Cir. Feb. 25, 2022). "In a fundamentally fair bond hearing, due process has three essential elements." *Id.* The noncitizen "(1) is entitled to factfinding based on a record produced before the decisionmaker and disclosed to him or her; (2) must be allowed to make arguments on his or her own behalf; and (3) has the right to an individualized determination of his [or her] interests." *Id.* (quoting *Kamara v. Att'y Gen. of U.S.*, 420 F.3d 202, 211 (3d Cir. 2005)). A court may not grant relief merely because it believes the IJ should have weighed the evidence differently, as that argument challenges a discretionary determination that district courts may not review. *See Ghanem*, 2022 WL 574624, at *2.

On this record, the Court finds that Petitioner's bond hearing was fundamentally unfair. From the outset, the DHS attorney provided the IJ with the credible fear interview transcript mid-hearing and did not disclose to Petitioner that it planned to question her about the statements she made during her credible fear interview. The Immigration Court has broad discretion under 8 C.F.R. § 1003.19(d) to base its custody determination on "any information available to the Immigration Judge or that is presented to him or her by the [noncitizen] or the Service." Even if the IJ was free to accept the belated submission, there is little to no indication that the IJ actually reviewed the credible fear interview transcript in its entirety, particularly the clarifying portions of the interview where Petitioner stated she was not a member of AD and that the "work" she performed for J.V. consisted of forced sexual relations and assisting him in collecting money, which she allegedly did unwillingly and under the constant threat of violence to her and her daughter. The IJ's broad discretion does not permit him to accept new evidence mid-hearing as proof of dangerousness without reviewing it thoroughly, considering its context, or providing Petitioner with a meaningful opportunity to explain or rebut it.

This matter is readily distinguishable from *Ghanem*. There, the petitioner claimed police reports were submitted on the day of the hearing and were not reviewed, but the "IJ's and the BIA's written decisions included specific citations to the reports[,]" which belied the petitioner's claims. 2022 WL 574624, at *3. The decision in this case is not supported by specific citations or clear reasoning. Indeed, the IJ's reasons supporting his decision are convoluted, and the Court cannot discern what led him to conclude that Petitioner is a danger to the community. For these reasons, the Court finds that Petitioner's hearing was fundamentally unfair.

Habeas remedies are flexible, and this matter involves repeated violations of Petitioner's due process rights.[3] In light of Petitioner's unlawful detention under § 1225(b)(1), the failure to provide her with an adequate bond hearing under § 1226(a), and the length of Petitioner's detention, which has exceeded several months, the Court orders Respondents to provide her with a new bond hearing at which DHS bears the burden of proving that Petitioner is a danger or a flight risk by clear and convincing evidence. If the Immigration Court considers the evidence and determines that DHS has not met that burden, Petitioner shall be released on bond to be set by the Immigration Court. Should the IJ determine that DHS has met that burden, he or she must support

---

[3] Petitioner asks for immediate release, but the Court does not grant that remedy. Where there is a blatant violation of a Petitioner's due process rights, such as the IJ's refusal to consider evidence, Courts in this District have ordered a new bond hearing before a different IJ or outright release. *See Alonzo v. Francis*, 2026 WL 1492819, at *2 (D.N.J. May 28, 2026) (finding that bond hearing was unfair when the IJ "refused to consider the documents Petitioner submitted in support of his bond application" because they were submitted "too late" and ordering a new bond hearing before a different IJ) (Wigenton, J); *see also Altamirano v. Cabezas*, 2026 WL 867135, at *3-4 (D.N.J. Mar. 25, 2026) (ordering release where "[i]t is clear that no actual bond hearing occurred here and that the proceeding before [the IJ] was fundamentally unfair") (Cox Arleo, J.). Here, Petitioner's prolonged detention without an adequate bond hearing is primarily due to the actions of DHS, which justifies shifting the burden to DHS to prove that she is a danger or a flight risk.

its findings with an adequate explanation on the record, including clear citations to record evidence.

**IT IS,** on this 8th day of September 2026,

**ORDERED** that the Motion to Enforce the Court's June 23, 2026 Order is GRANTED; and it is further

**ORDERED that, within seven (7) days, Respondents shall provide Petitioner with a new bond hearing at which DHS bears the burden of proving that Petitioner is a danger or a flight risk by clear and convincing evidence; Petitioner's counsel shall have notice of the bond hearing, a reasonable opportunity to prepare, and be permitted to reschedule the hearing outside the seven-day period, if necessary, without seeking this Court's intervention; and it further**

**ORDERED that if the IJ considers the evidence and determines that DHS has not met its burden by clear and convincing evidence, Petitioner shall be released on bond to be set by the Immigration Court; should the IJ determine that DHS has met that burden, he or she must support its findings with an adequate explanation on the record, including clear citations to record evidence; and it is further**

**ORDERED** that within seven (7) days of that bond hearing, Respondents shall notify the Court of the outcome of that hearing, file a copy of the bond hearing transcript, and request to close this matter.

ROBERT KIRSCH
United States District Judge